**In re Eugene W. WINES.**

**No. 49236.**

Supreme Court of Missouri,

In Banc.

Sept. 9, 1963.

Raymond F. McNally, Jr., Gerhard J. Petzall, St. Louis, Sp. counsel, Walter M. Clark, St. Louis, Sp. representative, for informants.

William L. Mason, Jr., St. Louis, for respondent.

EAGER, Chief Justice.

The Bar Committee of the Twenty-Second Judicial Circuit has filed here, by leave, an information charging Respondent Wines with professional misconduct in violation of Rules 4.15, 4.22 and 4.47, V.A.M.R. The information contains nine counts. Mr. Wines has had his office for some years in the City of St. Louis. The Bar Committee had previously held both informal and for-

mal hearings; at the latter Respondent was present with counsel, but offered no evidence and tendered no explanations. After a finding of probable cause the Committee proceeded to file the present information. Respondent's answer consists of a complete denial of all charges. We appointed the Honorable Paul VanOsdol, retired Commissioner of this Court, as our Special Commissioner. He held extensive hearings in St. Louis and has filed a very complete report of his findings and conclusions. These will be referred to from time to time in the course of this opinion. The Commissioner has found Respondent not guilty on all charges, but he has seen fit to caution Respondent concerning a demonstrated carelessness in transmitting factual information to others and in his use of language in the same connection. Herein the Commissioner has said: "And I presume to *sternly admonish Respondent* to get 'close down' on his facts before stating them, and to state them as clearly and accurately as he can." In certain respects we disagree with the Commissioner's conclusions, as indicated later.

Respondent, now approximately 37 years of age, was graduated from the Law School of St. Louis University in 1953. For a time thereafter he worked as an insurance investigator and adjuster, and then entered the law office of one Henry Stoll, probably in 1955. The record does not show whether this arrangement was, in fact, a partnership but that is immaterial. We note this because there will be reference to Stoll later. He left that association in October 1957, thereafter maintaining his own law office. All of the claims involved here were for personal injuries or property damage or both. Respondent's counsel says that none of Mr. Wines' clients are complaining. However, the charges do deal with information given to representatives of insurers of those persons against whom the claims were made.

In order to attain some measure of conciseness in stating the facts from this large record, we shall group Counts 2 to 8, in-

clusive. In those Counts Respondent was charged with making false representations to insurers, as noted above. These concerned chiefly the omission or deletion of medical data in submitting a document which was labeled in each instance a "Resume." In several of these the words "favorable for recovery," appearing in the doctor's "prognosis," were omitted; in one (Count 3) there were also omitted the words, "I would not anticipate any permanent disability as a result of this injury"; in another (Count 4) the words, "The injuries appear to be soft tissue injuries." In Count 6, involving a claim of Mr. Wines personally following the dropping of an elevator, certain words in the medical history were omitted as follows: "The car bounced some and the patient stated that his right knee buckled partially, but he did not fall to the floor, but was able to catch his weight. All of his weight was on his right leg as his left leg was crossed over it, leaning against the back of the elevator."

In Count 8, the original medical report stated (in part) the following history,— "While waiting there, the car behind them stopped, but a third car failed to stop and rammed into the car behind them which threw the second car into their car." Mr. Wines' "Resume" stated this as: "While waiting there a car failed to stop and rammed into her car," thus eliminating the idea of a three-car accident. Each such resume was prepared by Respondent after he had received the original medical report from the doctor. The explanations tendered both by Respondent and by sundry lawyer and lawyer-claims representative witnesses for him was that the use of resumes, abstracts or summaries was a common practice in personal injury claims in St. Louis; that the *title* indicated that the document was not a complete or full copy, that these things were used as a device to get settlement negotiations started, and that the ordinary insurer or defense lawyer did not place full reliance upon them, but required further proof (usually the medical report) before actually *con-*

*summating* a settlement. Some of these witnesses testified in substance that, in their opinions, the use of such a document constituted notice that something was omitted, material or immaterial, perhaps including matters which the submitting lawyer did not wish to disclose for tactical reasons, such as the possibility of involving the doctor later in a complicating cross-examination. There was no real unanimity in the testimony of these witnesses, except for the fact that such things were used. Mr. Wines himself repeatedly expressed the view that so long as he labeled the document as a "resume" he might omit anything he pleased, and that the term itself was a red flag. Most of the insurance representatives testified that they placed some reliance upon these "resumes" though probably not full reliance. Respondent relied also in certain specific instances, upon the asserted fact that at the time he gave the resumes to an adjuster in person, he also let the adjuster look at the original medical report and make notes. In only one instance did Respondent's counsel seek to corroborate this contention by questioning the adjusters who testified, and that one had no specific recollection of seeing the original report. Respondent further asserted that he had discussed with one or more of the doctors the term "favorable for recovery" and had indicated that it was confusing. He testified that he talked to the partner of the interested doctor concerning the history of accident involved in Count 8 (related above), stated that the doctor could be "cut up" on cross-examination because of the phraseology, and stated that he would like to rephrase it to "make a little more sense." No express consent was shown. He further testified that the adjuster knew it was a three-car accident and saw the original of the medical report.

Without any exception the "resumes" involved here were typed so that they (quoting from the Commissioner's Report) "* * * considered alone and in themselves, were apparently complete and verbatim." In other words, except for the word "Resume" typed at the top, these documents would consistently *appear* to be complete reports in every detail, even to the typed signature and the reproduction of the doctors' letterheads at the top.

Count 9 charges that Respondent omitted from a document submitted to the insurer and giving medical information, the words underscored in the following quotation: "He was admitted to Christian Hospital complaining of pains in his back radiating down to his right hip *and up to his neck*"; also that, as to two different clients injured in the same accident, Respondent stated in the documents so submitted that medical costs to date were $90 and $85, respectively, whereas in truth the amounts so reported to him were $65 in each case. One of these documents so sent out was entitled "Copy" and the other bore no title or label at all. The documents were transmitted with a letter of November 18, 1955, signed in Mr. Wines' name, with small illegible initials under the name. The significance of the omitted words, supra, lay in the fact that there was testimony to the effect that, had they appeared, they would have raised some doubt as to the existence of a true whiplash injury, and would have caused the claims man to question the claim. Respondent testified that these supposed copies were sent out during his relationship with Mr. Stoll, that he generally worked outside the office, and that he seldom dictated letters, though he occasionally signed them. He denied all responsibility for the letter of November 18, 1955, transmitting the copies. The plain inference in his testimony seems to be that the letter was prepared by Mr. Stoll, though he did not so state. He admitted signing a letter of February 20, 1956, to the adjuster on these claims which letter repeated the amounts of the medical charges referred to above, and listed other expenses and loss of time; however, he denied having anything to do with any of the "dictation" in that file.

■ The facts with reference to Count 1 of the information are very complicated.

We shall abbreviate them when possible, but in a case of this kind the facts must be adequately stated. In that Count Respondent was charged with several different specifications of misconduct, as follows: (1) the misrepresentation of the contents of a medical report on a Miss Olabea Jehlen; (2) the misrepresentation of medical expenses incurred by Miss Jehlen and a Mrs. Bremer; (3) (4) and (5) misrepresentations that Miss Jehlen's car had been repaired, the value of the repair and the fact that the repair bill had been paid. All this arose out of one apparently minor collision between the car of one Carpunky and the one in which Miss Jehlen and her friend, Mrs. Bremer, were sitting somewhere in Illinois near St. Louis. Photographs appear to show only a minor dent and two or three small scraped places on the left rear fender of Miss Jehlen's car. Both of these women employed Respondent and he wrote a lien letter to the driver of the other car, which letter was referred to a firm of independent adjusters in Alton, Illinois. About a month later, on February 26, 1958, Respondent wrote to that firm enclosing "copies of medical reports" and stating further: "The property damage in this matter is approximately $110 and I can supply you with a paid bill if we are able to dispose of this case. The other expenses incurred are $75 medical for Miss Jehlen and $100 medical for Mrs. Bremer." Respondent produced as his Exhibit I what purported to be the original medical report on Miss Jehlen dated February 11, 1958; this was essentially a duplicate of the copy sent out by Respondent. Informants contended that Exhibit I was an altered report, omitting the words "Condition is improving" and "Re-injury of old injury" and with the insertion of the words "sacro-iliac sprain," in lieu of the wording supposedly appearing in the original report. The Informants attempted to establish that charge by evidence in substance as follows: that two representatives of the Association of Casualty and Surety Companies went to the doctor's office in October 1958 to see his records in this matter; one of those men

testified that they were shown the original report on Miss Jehlen, and that it differed in the aforesaid respects from the copy submitted to the insurer by Respondent; also, that the other representative made notes, which were produced (such other representative did not testify); a United States Post Office Inspector testified in substance that in the course of an investigation he saw a record (he thought on a manila card) containing the words now claimed to have been omitted. The doctor's former secretary-lab technician testified: that she typed Exhibit I and signed the doctor's name to it, but *not* on the date shown, February 11, 1958; she did not know when she did write it, did not recall being instructed to date it back, but noted that it was written in *elite* type, that she left this employment on November 1, 1958, and that an elite typewriter was first procured about two months before she left because she had broken the old, "pica" typewriter; she testified that either the doctor or one McGee (another technician) told her what to type in Exhibit I. The doctor and McGee testified, in substance, that no report was made except as shown by Exhibit I, and Respondent denied receiving any report which differed from the copy he sent out. Somewhat out of order, but while the reader may perchance have these facts in mind, we have concluded that on this first specification of Count 1, the Informants failed to establish the misrepresentations charged. Some circumstances raise a suspicion, it is true, but we cannot convict Respondent on speculation or suspicion.

The same secretary typed under date of February 11, 1958, bills for services to Mrs. (Miss) Jehlen and Mrs. Bremer in the respective amounts of $50 and $75; the latter bill was expressly stated to be for services "to date"; these were sent to Respondent. In the letter which the latter wrote to the adjusting firm on February 26, 1958, he stated as already pointed out that the "*incurred*" medical expenses were $75 and $100, respectively, in lieu of the figures just given above. Respondent's ex-

planation for this was that he called Mr. McGee (who seems to have had unusually varied duties and extensive authority for a non-medical employee) and was given the larger figures on the assumption that there would be further services. McGee more or less corroborated this. Neither woman returned to the doctor after the date of the bills, although Miss Jehlen had an appointment and failed to keep it.

Miss Jehlen's car had not been repaired, nor had she told Respondent that it had been. So far as she knew no estimate of the cost of repair had been made, although she said that Mr. Bremer had at one time mentioned that he would "have the car appraised." She had never received any estimate. Incidentally, she received no money on her claim and Respondent later told her that her case was dismissed. Specifications (3), (4) and (5) are based upon the sending by Respondent to the interested insurance adjuster of an "Auto Repair" bill of "Carr & Pagett," 2101 N. Florissant, dated January 20, 1958, addressed to Olabea Jehlen, and stamped "Paid"; the items were: "1 Quarter panel assembly 90.25, Labor & Painting 83.00, Tax 1.80," with a total of 175.05 (no dollar marks). Respondent's letter of April 18, 1958, to the adjuster stated, in toto: "Enclosed please find repair bill in this matter." Respondent had written a previous letter on February 26, as already indicated, stating that the property damage was approximately $110 and that "I can supply you with a paid bill * * *." Mr. Carr testified for Informants: that he was an automobile mechanic and was in 1958 operating a shop for mechanical repairs in partnership with Pagett; that he never did any body work or painting, that he made no estimate on this car, did not know Mr. Bremer or Miss Jehlen, that he gave no figures to Bremer, and that he kept no price lists on body parts; that he did know Floyd Allen, but had never authorized Allen to make out any repair bill for him. By way of impeachment it was shown that Carr had served a term for larceny in the Intermediate Re-

formatory in 1948 and 1949. The evidence for Respondent concerning the procuring of this paid bill was long, complicated and somewhat inconsistent. Mr. Bremer (the husband of one of the women involved) and one Floyd Allen testified; combining this testimony, it was in substance: that they procured a blank billhead stamped "Paid" from the shop in question and took it to Respondent's office in blank, but with certain figures on a separate paper which they had also procured at the shop. They further testified that they gave the *blank* "Paid" bill to Respondent's secretary and told her how to complete it. This was presumably on January 20, 1958, the date of the "bill." Allen knew Carr; Bremer did not. Allen testified: that he had known Respondent for 8 to 10 years; that he went with Bremer to see Carr about an estimate and Carr said he would look at the automobile at Miss Jehlen's home; that he and Bremer went back about three days later and Carr told him that he had not looked at the car; that he and Carr "got out the book on repairing" and figured out the cost as "approximately $100 some dollars" which figures Carr wrote down on a card, stamped a billhead "Paid," and gave him the figures and the billhead; that Bremer was sitting out in the car; that he, Allen, was "not concerned" with whether anything had been paid for the job, as that was "his business, it aint mine," and that all he wanted was an estimate. When asked if he had told Respondent's secretary that the bill had not been paid, he answered: "It ain't none of my business to tell that woman anything." This witness (Allen) was certain that he dealt only with *Carr*, and that he did not even see Pagett (the other partner) on the day in question, Allen was then operating a tavern, and Mr. Wines had represented him in three civil suits. Arthur Bremer partially corroborated Allen, testifying: that Respondent had called him about getting an estimate on the car, and that he asked Allen "sitting with me at that time at the bar if he knew of anybody that was in that business." That Allen suggested Carr or

Pagett and they went there; that the man they talked to (whom Allen told him was Carr) said that he would look at the car; that they went back a few days later but on that occasion he merely sat in the car; that Allen came out, said "they made an estimate of the car," and that they went to Respondent's office where Allen gave the "estimate" to the secretary and she "typed it out"; on cross-examination Bremer identified an affidavit he had executed stating that the "bill or estimate" had "been supplied me by Mr. Pagett"; he then testified that the man might have been either one. This witness admitted the payment of two fines on charges of setting up a handbook and establishing a lottery. He had introduced Respondent to Miss Jehlen. The adjuster who received the receipted repair bill had that phase of the matter investigated, after which he called Respondent and denied "the claim in its entirety." He testified that Mr. Wines replied that evidently they had information which he did not have and that he did not want to be "embarrassed." Respondent's explanation to the Commissioner was that the "Paid" bill did not come to his attention until shortly before he sent it out, and that previously he had been told by Bremer that the estimate should run about $100 or $110. In essence the defense was that Respondent had relied on this bill for the cost of the repair of the car and knew nothing personally of the facts.

■ Rule 4.15 prohibits, in the pursuit of a client's cause, "any manner of fraud or chicane"; Rule 4.22 requires "candor and fairness" in the conduct of the lawyer, and forbids the making of knowing misquotations; Rule 4.47 provides that a lawyer "should always maintain his integrity," and generally forbids all misconduct injurious to the interests of the public, the courts, or his clients, and acts contrary to "justice, honesty, modesty or good morals." Our Commissioner has accurately paraphrased these rules as follows: "An attorney does not have the duty to do all and whatever he can that may enable him to win his client's cause or to further his client's interest. His duty and efforts in these respects, although they should be prompted by his 'entire devotion' to the interest of his client, must be within and not without the bounds of the law. The office of attorney does not permit, much less does it demand of him for any client, violation of the law or any manner of fraud or chicane. His conduct should be characterized by candor and fairness. He should not knowingly misquote the contents of a paper, nor willfully commit any act against the interest of the public. His conduct always should be in harmony with justice, honesty, modesty and good morals."

Little would be gained here by a review of the cases stating the principles followed by our Missouri Courts in disciplinary matters. See, generally: In re Randolph, Banc, Mo., 347 S.W.2d 91; In re Sympson, Banc, Mo., 322 S.W.2d 808; In re Conner, 357 Mo. 270, 207 S.W.2d 492; In re Downs, Banc, Mo., 363 S.W.2d 679; In re Veach, Banc, 365 Mo. 776, 287 S.W.2d 753. Perhaps the guiding principles are as well stated in Downs, supra, at 363 S.W.2d loc. cit. 691, as elsewhere: "The theme running through these and many other cases is that the primary and ultimate purpose of disciplinary proceedings is to protect the public, the integrity of the Bar, and the courts, from the practice of law by persons unfit to serve as members of the Bar,—and that the courts have 'a solemn duty to the public and to the legal profession to enforce the code of ethics governing the conduct of attorneys.' Sympson, supra. There is no inherent right to continue in the practice of law, but rather it is a mere privilege which will be withdrawn when one proves himself unfit. [In re] Canzoneri [Mo., 334 S.W. 2d 30], Conner, supra." Counsel have cited various outstate cases which may be somewhat closer to the present facts than our own, but we find it unnecessary to delve into them. One cannot expect to find an exact blueprint in a case of this kind.

■ It is clear that in all such matters as this the findings and conclusions of our

Commissioner are advisory only, and that the court must make its own findings, giving such credence as seems indicated to the Commissioner's views on credibility. In re Woodward, Banc, Mo., 300 S.W.2d 385; In re Downs, supra; In re Veach, supra. The Commissioner here has performed an exceedingly painstaking and workmanlike job in assembling and analyzing the evidence, but we are forced to disagree with certain of his conclusions.

On Count 1 we have already indicated a finding of not guilty on the first specification, namely, the sending out of a supposedly altered medical report on Miss Jehlen. The Commissioner also so found. We do, however, find Respondent guilty on the other specifications of that Count. The first of these charged the misrepresentation of inflated medical expenses as *"incurred"* expenses (letter of February 26, 1958, Exh. 2) when Respondent had bills in his possession showing the correct amounts, and when it appeared from his own evidence that any additional and added expense was merely problematical. The Commissioner attributed this action to the use of "careless or inadvertent language." There is no place in a lawyer's professional life for the use of language so loosely. The other specifications of Count 1, i. e., 4, 5 and 6, all involve misrepresentations made in the sending of the false receipted bill for the repair of Miss Jehlen's car. We find Respondent guilty on these. Concededly, the document was a "phoney"; Respondent merely claims that he did not know it. The car had never been repaired, and no estimate of the cost of repair had ever been made. We find from the evidence that Carr and Pagett did not do body work or painting, and there is at least a grave doubt in this court's mind as to whether Carr ever gave any figures at all to Bremer or Allen. The real question here is whether Respondent assumed any responsibility in sending this bill to the adjuster, after supposedly *finding it* in his file. We hold that he did. If there was no specific intent to deceive as the Commissioner found, there was nevertheless an in-dependent representation by him that the car had been repaired and the bill *paid,* when he knew no such facts and had made no effort whatever to investigate. The adjuster had asked Respondent to furnish "estimates of the damage * * * or the final repair bill * * *." This document could *only* have been submitted as the final repair bill; incidentally, it is almost inconceivable that the bill could have been in Respondent's office for nearly three months without his knowledge, after being typed by his own secretary. While the Commissioner found that Respondent was not "knowingly a party to an attempted fraud," we find that, at best, his acts in so carelessly dealing with the truth did not constitute that "candor and fairness" required of lawyers, and that such conduct was also contrary to "honesty" in its true sense.

We may consider together Counts 2–7, inclusive, noting some variations. These all concern Respondent's "resumes" of medical reports. In Counts 2, 4, 5 and 7 the only words omitted from the respective medical reports were "favorable for recovery," as they appeared at the beginning of the "prognosis." We shall not elaborate further on all the divergent views expressed by witnesses concerning the use, meaning, justification and composition of resumes or summaries. Webster defines a resume as: "A summing up; a condensed statement; abridgment, summary" (Third New International Dictionary). Some of the witnesses did not feel that a "resume" need be a true summary or condensation, and some felt that a lawyer might omit anything which he considered *injurious* to his client; also, that perhaps such a custom existed in that locality. A custom may not be regarded as a complete vindication when a lawyer is charged with misrepresentations. We agree that a lawyer in his negotiations with his opponent's representative may give as much or as little medical information as he pleases (except to the extent that Rule 60.01 is now applicable). But when he gives *any,* it should not be in such form as is likely to mislead or deceive; and we think

that the probability or likelihood of deception is the important element, regardless of any demonstrated, affirmative *intent* to deceive. Here the "resumes" were so prepared that they appeared in all respects to be copies; some were rather lengthy; they carried reproductions of the respective doctors' letterheads, copies of the signatures, occasionally the initials used to show dictation, and they were all paragraphed (as a complete report would be) into such divisions as "Chief Complaint," "Past History," "Physical Examination," "Diagnosis," etc. There were no indications of deletions. In this situation we hold that any material omission was a thing calculated to deceive. In Counts 2, 3, 4, 5 and 7 the words "favorable for recovery" were omitted from the prognosis, but a comparison of the original medical reports with the resumes demonstrates that the remainder of the "prognosis" in each such case, as furnished, was sufficient to give a reasonably clear idea of the true opinion of the doctor; the same is true of the omission of the words "I would not anticipate any permanent disability as a result of this injury" (Count 3), for the resume actually stated: "A soft tissue injury & will probably heal without complication." Thus, while we do not approve of deletions in a resume submitted in *that form,* we find Respondent not guilty on Counts 2, 3, 4, 5 and 7, because, in our opinion, nothing material was omitted or misrepresented. The same principle applies to Count 6, where, in Mr. Wines' personal claim for injuries due to the fall of an elevator, the resume omitted the following: "The car bounced some and the patient stated that his right leg buckled partially, but he did not fall to the floor but was able to catch his weight. All of his weight was on his right leg as his left leg was crossed over it, leaning against the back of the elevator." While again, we do not approve of an omission in a document prepared and submitted in that form, we fail to see that this omission could have materially misled the insurer. We find Respondent not guilty on Count 6. The evidence on Count 8 was that in submitting a resume of the medical report on Miss Betty Brockman, Respondent altered the history given to the doctor. That history was: "While waiting there, the car behind them stopped, but a third car failed to stop and rammed into the car behind them which threw the second car into their car." In lieu of that history, Respondent submitted in his resume the following: "While waiting there a car failed to stop and rammed into her car." It is obvious that this was not a mere omission, but an affirmative misstatement of fact. We have in mind Respondent's attempted explanation that the adjuster knew that this was a three-car accident, that he showed the adjuster the original medical report, and that he called the doctor, telling him that the recital was confusing. The adjuster did not fully corroborate that testimony, and the altered report went into his files. We cannot overlook a positive misstatement of fact submitted in such a document. We find Respondent guilty of misrepresentations as charged on Count 8.

The evidence on Count 9 involved the claims of two persons—Smith and Carver; supposed copies of these medical reports (not resumes) were submitted to the insurer, one being marked "copy" and the other bearing no title but clearly purporting to be a copy. In these documents "medical cost to date" was stated, respectively, as $90 and $85 (both figures indicating erasures and rewriting). The doctor's longhand, original reports, directed to Respondent's then law firm, were received in evidence. The "med cost to date" in each instance was shown as $65. The original report on Smith included the following: "He was admitted to Christian Hospital complaining of pains in his back radiating down to his right hip and up to his neck." In the *"copy"* submitted the last five words were omitted. The interested claims man testified that, had these words been included, he would have questioned the claim because of the rather unusual symptoms for such an injury. Respondent denied all connection with a letter sending out those copies under date of November 18, 1955. He admitted

signing a letter to the adjuster dated February 20, 1956, in which the inflated amounts of medical expenses were repeated, among various other claimed items of damage, but denied dictating it. Respondent apparently gave the original medical reports to the defendant's attorney when both claims were settled, but only after the suit on one had been assigned for trial. Respondent, in substance, denied all knowledge of these changes, refused to fix specific responsibility on anyone, but apparently inferred that his partner was responsible. The submission of the Smith copy was not justified upon any theory of "resume," nor were the inflated medical figures explained. The Commissioner has found that Mr. Wines was, at the time, doing work largely out of the office, that he was new in the practice and prone to rely upon an older partner, and that he was not responsible for the preparation of these documents. While we feel that he was extremely careless in permitting the use of his name on such documents without checking the facts, we accept the finding of the Commissioner that he was not guilty of the misrepresentations charged in Count 9.

We come now to our principal difference with the Commissioner, namely, his ultimate conclusion. He saw fit merely to admonish the Respondent against accepting and passing on information without verifying it, and against carelessness in the use of language. We feel that the extent and duration of the practices Respondent thus engaged in, his rather callous attitude toward the use of "resumes" regardless of their obviously deceptive appearances, his affirmative alteration of the history of accident in one case, the alteration of "incurred" medical expenses, and the submission (with *no* investigation at best) of an admittedly false receipted bill for car repair, impel us to go further. Respondent saw fit to offer no testimony before the Bar Committee and he has required, as was his privilege, a full hearing before our appointed Commissioner, after making a pleaded denial of all charges.

Under these circumstances it is the judgment of the Court that Eugene W. Wines be and he is hereby suspended from the practice of law in Missouri for a period of six months from October 1, 1963, and that all costs are hereby adjudged and taxed against Respondent. The suspension for such period is imposed to emphasize the effect of the reprimand which this opinion constitutes.

All concur, except HOLMAN, J., not sitting.