STATE of Missouri, ex inf. Thomas F.
EAGLETON, Attorney Gen-
eral, Relator,

v.

Arthur ELLIOTT, Respondent.

No. 49832.

Supreme Court of Missouri,

En Banc.

July 28, 1964.

Thomas F. Eagleton, Atty. Gen., Robert D. Kingsland, Asst. Atty. Gen., Jefferson City, for relator.

Dick B. Dale, Jr., Wilson D. Hill, Richmond, Jack C. Jones, Carrollton, for respondent.

DALTON, Judge.

This cause comes to the writer on reassignment. It is an original proceeding in quo warranto instituted in this court when the Attorney General of Missouri filed his information against respondent, as Sheriff of Ray County, charging respondent with willful and malicious oppression, partiality, misconduct and abuse of authority in said office in specified respects; and alleging that by reason of such facts and conduct the respondent had forfeited his office and was unlawfully usurping and holding the same. The information further prayed the court by its order and judgment to so declare that respondent had forfeited his said office by reason of the facts alleged; that the office of Sheriff of Ray County be declared vacant; and that the court enter such other orders, judgments and decrees as the court deem just and proper. Respondent, by answer, admitted that he was the duly elected, commissioned and acting Sheriff of Ray County, but denied the specific allegations of misconduct as set forth in the information. Thereafter, this court appointed Honorable Latney Barnes of Mexico,

Missouri, as Special Commissioner, to hear the testimony that might be offered by the parties and report his findings of fact, conclusions of law and recommendations in the premises to this court.

The Commissioner held a pretrial conference with the attorneys for the parties, set the cause for hearing, heard the evidence presented, prepared his report, including findings of fact and conclusions of law, and filed the same in this court, accompanied by a complete transcript of the pleadings and evidence presented before him. The Commissioner found that the E. V. Jackson General Merchandise Store at Camden, Missouri, owned by a cousin of respondent, was burglarized on February 22, 1962, and certain property was taken, including a safe and billfold; that both the safe and the billfold were later recovered on April 18, 1962; that, thereafter, on June 7, 1962, one Billy Harwood Eaton was arrested and charged with the burglary and his 1957 DeSoto automobile was parked near the jail; that, thereafter, the mentioned "billfold was deliberately placed or 'planted' by the Respondent in the Eaton car with the malicious, corrupt and fraudulent intent that it be 'discovered' and used as evidence against, and for the purpose of convicting, Billy Harwood Eaton of the Jackson burglary; that such conduct on the part of the Respondent in his official capacity and under color of his office of Sheriff of Ray County, Missouri has rendered him guilty of such willful, fraudulent and oppressive conduct of his office and official duty with respect to the enforcement of the criminal laws of the State of Missouri that he has and should be declared to have forfeited his office as Sheriff, under Section 106.220 R.S. Mo. [V.A.M.S.] and the law of this state * * *."

The cause has been briefed, argued and submitted in this court. Respondent's brief states: "The statement of the Attorney General is adopted and accepted by the respondent as true." In view of this statement in respondent's brief, we shall set out this approved statement of facts (omitting only page reference to the transcript of the evidence). Additional facts appearing in the record will be stated in the course of the opinion, since we find the approved statement incomplete in material respects.

The statement is as follows: "On February 22, 1962, the E. V. Jackson general store at Camden, Missouri, was burglarized. The respondent and his deputies made an investigation at the scene of the burglary on this same day. Among the items taken in this burglary was a safe containing jewelry, checks and several thousand dollars in cash. Relator's evidence showed that there was also an old billfold taken in this burglary. This was denied by the respondent. The relator's evidence showed that the highway patrol was not called to assist respondent in the investigation of this case until April 18, 1962, when the safe taken in the Jackson burglary was found abandoned in a culvert near a gravel road north of Fleming, Missouri. On that date respondent notified Trooper M. C. Carroll of the highway patrol of the location of the abandoned safe, and the trooper went to the scene. Also present at the scene of the safe recovery were respondent's chief deputy Dan Keller, Mr. E. V. Jackson, the victim of the burglary, Mr. Harrison Hicks, the brother-in-law of Mr. Jackson, and one Sammy Schrier, who at the time of the trial resided in the Missouri State Penitentiary upon a conviction for burglary and larceny.

"The relator's evidence showed that in addition to the safe, Trooper Carroll found, in that general area, a few coins, some charred paper and a leather billfold which he identified as relator's Exhibit No. 1. This billfold was in two pieces and mended by coarse thread or stitching. Trooper Carroll testified that after examining the billfold, he handed it to respondent. Trooper Carroll also testified that he did not see the billfold again until the evening of June 17, 1962, in the office of the Prosecuting Attorney of Ray County.

"On June 7, 1962, one Billy Harwood Eaton was taken into custody by Trooper

John Wright of the highway patrol and Chief Deputy Dan Keller on suspicion of having committed the Jackson burglary. After he [Eaton] was taken to the Ray County jail, his 1957 DeSoto automobile was searched by the respondent, Trooper Wright and Dan Keller. In the course of this search, the rear seat of the automobile was taken out by Trooper Wright and nothing of evidentiary value was found beneath the seat. The car was then left parked at that location. The automobile was not locked as the door latch was defective.

"The morning of June 14, 1962, the respondent contacted Trooper Wright and requested that he again search the Eaton car, saying there was additional evidence in the car pertaining to the Jackson burglary. As they approached the automobile, the respondent told Trooper Wright to look under the rear seat. Upon looking under the rear seat, Trooper Wright found relator's Exhibit No. 1. That same day E. V. Jackson identified this billfold as being in his safe when it was burglarized. This same billfold, recovered from the Eaton car, was identified by Trooper Carroll several days later and at the hearing [of this cause] as the billfold he had found at the scene of the safe recovery April 18, 1962, and turned over to respondent."

Respondent had been a part-time farmer and a part-time construction worker, prior to being elected Sheriff of Ray County. He was crippled when he was six years old and, thereafter, walked with a limp. He was elected sheriff in November, 1960, after three previous unsuccessful campaigns.

With reference to the burglary of the E. V. Jackson store, respondent testified that on February 22, 1962, Mr. Jackson reported that his money safe had been removed from the store; that it contained old coins that would figure around $5,000 in cash; that there was $4,000 worth of good checks in the safe, his mother's watch with three large diamonds in the face; that there were some abstracts to his property and other things, but that Mr. Jackson never said a

word to him about a wallet being in the safe. It was the largest burglary respondent had "worked" in the county. He said it was "an awful big case" and he worked hard on it. "I worked 8 or 9 days without my shoes off of my feet on this robbery."

As stated, respondent was a cousin of E. V. Jackson. Jackson's mother and respondent's father were "brother and sister" and respondent had lived in the Jackson home when he was "between 8 and 10 years old." During the time he lived in that home he had seen the billfold in question frequently.

Respondent further testified that Sammy Schrier, a prisoner in respondent's jail whom respondent had used as a trusty, offered to show respondent where the safe was hidden and proceeded to do so about April 18, 1962. It was hidden in a deep ravine in some brush six miles from Camden. Respondent testified: "Well, it hadn't been there but just a few days, I judge three or four." The reason for respondent's conclusions were not stated. Respondent further testified that Schrier had told him that he had found the safe when he was out "a-mushroom huntin." There was evidence that Schrier did not commit the Jackson burglary on February 22, 1962, since he was locked in jail at the time, but he told respondent that Billy Harwood Eaton committed the burglary.

Marlin C. Carroll, a Missouri Highway Patrolman assigned to Lafayette and Ray Counties, testified that he received no official report from anyone about this burglary, but he did hear of it several days after February 22, 1962. He never investigated the scene of the burglary. On April 18, 1962, he received a call from respondent to the effect that the safe had been found some two miles from Camden, a mile north of Fleming on a gravel road. When the officer arrived he found the respondent and a deputy, Dan Keller, also E. V. Jackson, Harrison Hicks and Sammy Schrier. Hicks had a pick-up truck to haul the safe back to the Jackson store. According to Carroll the safe was in a brushy ravine 20

to 25 feet deep. In the immediate area along the roadside the witness found fire clay from the safe and charred paper and a leather billfold. Concerning the billfold, he testified that he "picked it up and looked at it and looked through it and then gave it to the Sheriff [respondent]." There was some conversation about it, but the exact words he could not recall. He noticed the billfold was in two pieces and had been mended by some coarse thread, also referred to as "stitching" on the bottom part. He did not mark it. He had never seen a wallet like this one before, nor one in the same condition. It was "alongside this gravel road" about 25 feet north of where the safe had been rolled down the bank, and therefore 45 or 50 feet from where the safe was discovered at the base of the ravine. He didn't show the billfold to Mr. Jackson or have him determine whether it was his property. When Carroll last saw the billfold the respondent had it in his hand.

Respondent testified that immediately after the safe was discovered he and his deputy and Trooper Carroll and others went to the place where Sammy Schrier, a trusty from the Ray County Jail, had discovered it. Respondent further said that when he arrived and got to looking around "there was an old patent leather pocketbook, an old woman's pocketbook"; that he personally found and showed the pocketbook to Mr. Jackson; and that Mr. Jackson said it was not his mother's pocketbook and threw it down. Respondent insisted that Trooper Carroll never picked up the billfold in question here; and that he never handed it to him; that he (respondent) never had that billfold in his possession.

Trooper Carroll testified that he did not see the billfold from the time he handed it to respondent until June 17, 1962, in the prosecuting attorney's office, when Mr. Cameron, Trooper Wright and Sgt. Closson were present. At that time the billfold was taken from an envelope sealed with transparent tape, and with officers' names written on the envelope. Before Trooper Carroll was permitted to see the billfold on the evening of June 17, 1962, he gave the officers the following description of the billfold he had found and delivered to respondent: "I told them it was, it was an old, badly deteriorated billfold similar to the type carried by many truck drivers. The billfold was very old and had been repaired with some coarse string or thread on the bottom of it."

As to what had happened subsequent to the imprisonment of Eaton on June 7, 1962, and before the meeting in the prosecuting attorney's office on June 17, 1962, the record shows the following:

On June 7, 1962, Eaton was arrested and transferred from the Clay County Jail at Liberty to the Ray County Jail at Richmond, Missouri, by respondent's deputy Dan Keller and Trooper J. W. Wright. On that date, after Eaton's car was parked and Eaton locked up, Trooper Wright, Dan Keller and several others, including respondent, searched "the entire automobile." The "outside of it, underneath it, the trunk area, the inside compartment, passenger compartment, glove compartment * * *. The [rear] seat was removed from its position and turned up between the front seat and what would normally be the back seat and allowed to rest on its edge." Nothing was seen beneath the rear seat. "There might have been some dirt or papers, particles of papers or something, but nothing of any significance to the crime."

Concerning this search respondent testified that Trooper Wright, Trooper Carroll and Dan Keller came and told him that they were going to search the old DeSoto car that belonged to Bill Eaton, who was in the Ray County Jail; that they had brought the car over and left it in front of the jail on the 7th of June and the first day they searched the car "was on the 8th day of June. * * * I was there; yes, sir." As to the search, he said: "Well, they took up the floorboard; they took the two cushions out of the car; they run their arms back; they unloaded the tools * * * they laid

it [the tools] out on the ground and they raised the hood of this car up."

Trooper Wright did not see Relator's Exhibit No. 1, the billfold, when he searched the car and he took the rear seat out, "all of the way." The search of the car revealed the following: "There was a 22 Rifle found, a small plastic bag—just personal items. Tools in the trunk, electrical tools. That's about all." According to Trooper Wright the .22 rifle was released to respondent, Sheriff of Ray County, for safekeeping. The property in the Eaton car was "left intact," except that the rifle was removed for safekeeping. The car lock was defective and it could not be locked up, but the car was not removed. The same officer, Trooper Wright, searched the same car at the same location again on June 14, 1962. The reason for the second search was stated by Trooper Wright as follows: "I had been contacted by Sheriff Elliott [at the courthouse around 10:30 a. m.] and requested that I go back to the car. He said there was some additional evidence in the car. * * * He stated he wished I would search the car again, there was some additional evidence in the car," which he said pertained to the Jackson burglary. The officer further testified: "He and I proceeded to the car, where it was parked on South College, and as we approached the car, he said: 'John, look under the rear seat.' And that's what I did, and discovered the leather folder there. * * * It was under the rear seat." I found it by "just pulling the seat up. * * * It was laying directly beneath the rear portion of the seat. * * * It was the brown leather folder," Relator's Exhibit 1. He first saw it in Eaton's car on June 14, 1962. He replaced it under the back seat, put the seat back over it and nobody at that time viewed the wallet or billfold except him and respondent. At the request of respondent E. V. Jackson came up there a few minutes after the wallet was discovered. Trooper Wright again removed the wallet and asked Jackson about it and Mr. Jackson stated that it was the folder that was in his safe when it was burglariz-

ed. After the folder was put back in the car again, and after the respondent and Jackson had stated that it was the folder that was taken in the burglary, a search warrant was applied for and Sgt. Closson of the highway patrol was informed. Trooper Wright requested the search warrant, but did not file an application for it. After the search warrant was obtained, the car was again searched in the afternoon between 2 and 3 o'clock. Trooper Wright, Sgt. Closson, Sheriff Elliott and George Spurveck, a deputy sheriff who had signed the warrant were present, together with Eaton, and all of the officers participated in the search. On this search Trooper Wright found the wallet in exactly the same position where he had left it on the prior occasions when he had found it. Relator's Exhibit No. 1, also referred to as a leather folder, a wallet, or billfold was then taken into custody and placed in a manila envelope. The envelope was sealed in the presence of the officers and signatures placed thereon, although some officers merely initialed it. E. V. Jackson again stated that the wallet was in his safe at the time it was burglarized. When he identified it he referred to some hand stitching that was on the bottom of it. The officers did not see the wallet again until the envelope was opened in the prosecuting attorney's office on June 17, 1962 when Sgt. Closson, Trooper Carroll, Trooper Wright and Prosecuting Attorney Cameron were present. The seal was then broken in their presence and the wallet was taken out of the envelope.

On cross-examination, Trooper Wright said that George Spurveck and the respondent were present when the car was first searched on June 7, 1962, when it was first brought back to the Richmond jail. He further testified that it would almost have been an impossibility to have overlooked the presence of the leather wallet or billfold in the car when the first search was conducted. When he and the sheriff searched the car the second time they had no search warrant, but he did have a warrant for the third search. The witness testified that

the old leather wallet removed from the envelope was the same wallet that he saw in the Eaton car on his second and third searches. His identification was based on the physical characteristics of the wallet, as well as seeing it placed in the manila envelope and sealed, marked and, thereafter, the seal broken and the exhibit removed in his presence. He again testified that, at the time of his first search of the car on June 7, 1962, there was no such wallet at the place he found it on the second and third searches of the car.

It is not necessary to review the testimony of other officers with reference to most of the foregoing facts; however, we shall now review the respondent's personal testimony in some detail.

Respondent testified that, at the time of the first search of the Eaton automobile on June 7, 1962, he saw a gun ("brand new rifle") on the floor board of this car; and that "this gun disappeared out of the car about the second day that it was there. That would make it on the 8th of June." He further said: "The search—the first day they searched the car was on the 8th day of June. * * * I was there; yes, sir." He also testified that he had personally checked the car on the 8th or 9th, he thought it was the 9th, and he thought his deputy had taken the gun out of the "back end of the car." At the time he found the gun missing he looked under the back seat of this automobile and saw "that old rag right there" lying under the back seat; but the gun was gone. He also testified, "I never touched that wallet—I saw it up under the back seat," but that he (respondent) was present later when the wallet was taken out and when some nine people were present; that Sgt. Closson "throwed this wallet out on the ground * * * [and] laid all of the tools on the sidewalk"; and that "Sgt. Closson held up a blue money bag that had 'Commercial Bank, Lexington, Missouri' on it" and Sgt. Closson asked Mr. Jackson if that was his money bag and Mr. Jackson said "No"; and that when the wallet was removed from the car Jackson further said:

"That looks like Pap's old billfold"; and that Mr. Jackson also said that he could tell "Pap's" old billfold by some sewing on the bottom of it, "it had some whipped cord on it." Jackson later said: "It looks like my sewing. I done the sewing." Respondent further said that he had never seen the pocketbook until the night before when he was looking for that gun and figured that his deputy had "hooked" that boy's gun. When respondent found the rifle missing, he promptly repossessed it from a deputy sheriff and returned it to the Eaton car.

Respondent also testified that he searched the Eaton car three days after Eaton was brought to the Ray County Jail and that he then saw the billfold lying back of the seat and that he recognized the billfold since "it looked like the old billfold." Later he said he did not recognize this billfold as the billfold he had seen at the Jackson place of business.

Respondent further testified that he didn't know whether the billfold was in the car at the time of the first search or not; and that the reason he searched the car after the first search was because he was afraid someone had removed the .22 rifle and he found it gone, as stated, and did find the billfold. Respondent said he was alone at the time he made this search, but that, after seeing the billfold he called Sgt. Closson and told him he wasn't satisfied and wanted the car searched again. Respondent further said: "The first day the car was searched there was a rifle, not back in under the back seat but laying on the floor where the seat sets. That rifle was laying there on the tin where the seats rest on the car." He also said: "We never bothered that rifle then. * * * That rifle was left there; yes, sir." He also said that he did not see the highway patrol search the car the three times that they searched it. He did say that he saw the patrol search the car between three days after the first search and the search on the 14th. One of respondent's deputies was in the Eaton car at that time and two or three patrolmen were around it.

He admitted the correctness of his prior deposition testimony taken on March 22, 1962, as follows: " 'Was there a search made in Richmond?' And your answer: 'Yes, I guess the car set there, I believe about the third day. I went home one day for dinner and there was John Wright and Trooper Carroll and Sergeant Closson going through that car and they was searching it as I was going to dinner.' Q. 'And when was this?' A. 'That was about the third day after the car arrived at the parking meter.' Q. 'And what part of the car were they searching?' A. 'Front end and back end both. Two men in the car and one standing out. Closson was in the front, and I think Carroll was in the back.' Q. 'Would you say whether the man in the back, what he was doing?' A. 'He was going under the back seat.' Q. 'What part?' A. 'The cushion.' Q. 'And what else did you see up there?' A. 'I went on and ate my dinner. I never said a word and it wasn't my job. They was working it, and I went on about my business.' " "Do you recall those questions and answers, Sheriff? A. Yes, sir. My answer is yes. Q. Then your answer is, Sheriff, that you did see the Highway Patrol search underneath the back seat before June 14th? A. He was in there, Mr. Kingsland, and I couldn't tell where his hands were. I had a patch on this eye and the other one, I had just took the patch off and I couldn't tell you."

At the trial respondent denied that he had personally or by someone else caused the wallet to be placed in the Eaton automobile. Respondent also said that, when the "highway patrol" searched the car on the third day, "Well, they found some old checks. * * * There was some little pieces of checks there * * * from the burglary," and he gave the piece of the old check that was found in the Eaton car to Mr. Jackson, and that he talked to the Highway Patrolmen Closson, Carroll and Wright, and to Mr. Jackson about it. There was other testimony that no such checks

or pieces of checks were found by the patrol in the car or at any other place.

As to his reasons for wanting the car searched a further time, respondent said: "What I wanted it searched for was several reasons. I had done taken pictures of the back end of that car," where two dents on the lid of the trunk matched the safe and there were marks of the safe having entered the car. The respondent testified that dents on the lid of the trunk of Eaton's car matched the measurements of the safe, and there were prints made by the safe on the floor of the trunk. Sgt. Closson, however, testified that he measured the safe and compared these measurements with the dents in the trunk of the car and stated that the dents could not have possibly been made by the safe. Sgt. Closson also testified he did not see any wheel marks on the floor of the trunk of Eaton's car.

The record also shows, as stated, that the Eaton car had been parked, unlocked, on a public street after June 7th, 1962; that it had been diligently searched the day it arrived in Richmond, Missouri, and nothing was found in the way of a billfold; that it had been removed to a garage for pictures to be taken of dents in the car; and that the car had been searched by various officers at various times, before a search warrant was issued for the search on June 14, 1962.

Respondent insisted that he reported the burglary to Sgt. Closson of the State Highway Patrol on February 23, 1962, the day after the Jackson store was burglarized. Sgt. Closson, however, denied that the burglary was so reported or that he had worked with respondent at any time on the case prior to April 19, 1962. The sergeant also denied that there were any dents in the car made by a safe; and denied that the finding of any checks or pieces of checks were reported to him by respondent. Sgt. Closson also testified that he did not search the Eaton car three days after Eaton's arrest, but that he searched it only on June

14, 1962. He further testified that on April 19, 1962 in the presence of respondent, Mr. E. V. Jackson, owner of the burglarized store, gave Sgt. Closson a list of the things taken in the burglary, including "this old-type billfold that he described at the scene as being hand stitched"; however, at that time nothing was said to him by respondent or others about the recovery of this billfold.

Respondent's brief states: "It is admitted by all, that the Troopers and Sheriff were on the friendliest and best terms." It is argued further that it was only natural in view of the number of searches of the Eaton car that respondent would be confused as to the times, dates and officers making the searches. It is pointed out that the sheriff was 69 years of age at the time of the hearing; that he had suffered a disability since childhood and that during the time of the Eaton arrest and the searches of the Eaton car respondent was undergoing and recovering from surgery on his eyes. It is also argued that in view of the testimony offered as to the good reputation of respondent in Ray County for honesty and integrity, a reputation that relator did not seek to rebut, it is incredible that respondent "with a reputation for such integrity and status in his community and among his fellow officers would attempt such a 'crude' method to fabricate evidence as charged." It is also pointed out that the burglary was committed on February 22, 1962; that the safe was not located until April 18, 1962; that the Eaton car was not searched and the wallet found *under a search authorized by a search warrant* until June 14, 1962; that there is no evidence in the record that the wallet was ever *accepted as evidence* by the prosecuting attorney "to be used in the case against Eaton"; and that the record fails to show that the troopers questioned respondent's statements about the wallet, but instead they accepted his testimony as new or additional evidence against Eaton.

Respondent argues that it was necessary for relator to show that the wallet was placed in the Eaton car; and that it was placed there by respondent for the purpose of fabricating evidence against Eaton on the charge of burglary.

Respondent also insists that the relator presented no direct evidence that respondent "planted" the wallet in the Eaton car and hence must rely on circumstantial evidence "to establish the basic premise that the wallet was planted" by respondent. Respondent says that "mere opportunity and motive are only circumstantial evidence"; and that " 'guesswork, conjecture and speculation,' " must be excluded in this circumstantial evidence case.

Respondent also insists that because "Trooper Carroll testified that Sheriff Elliott was the only person he saw with the wallet 3 miles northwest of Camden, Missouri, on April 18, 1962," the court is now asked to believe "that respondent placed or caused to be placed the wallet some three months later in the Eaton car." Respondent insists that the essential element of relator's case is, did respondent place the wallet in Eaton's car, and that relator has sought to make proof of that alleged fact by circumstantial evidence, but failed in the effort, and the proof offered amounts only to speculation, conjecture and guesswork.

Respondent further insists that the removal of a duly elected official from office for any cause is a harsh and drastic remedy; that the statutory provisions for forfeiture of an office should be strictly construed; that this court may properly exercise a sound judicial discretion in granting or refusing a judgment of ouster in this quo warranto proceeding; and that an ouster based upon circumstantial evidence should not be granted unless some good purpose can be served and the removal of the officer is in the public interest.

Respondent says that "Relator is asking the Court to remove from office an elected official, one who ran four times for Sheriff before successfully obtaining his commission"; and that the removal is sought because he is *suspected* of being guilty of the

charge against him, and that there is no direct evidence to support the charge.

In addition to the findings of the Special Commissioner hereinbefore set out, the Commissioner found: "The evidence to be clear, cogent and convincing that the billfold taken in the burglary of the Jackson store was found on the occasion of the recovery of the safe on April 18, 1962 and then and there delivered into the exclusive custody and possession of Respondent, Sheriff Arthur Elliott; that this billfold was not in the Eaton car at the time Eaton was apprehended and arrested for the crime on June 7, 1962 and that at the special instance and request of the Respondent another search of the Eaton car was made in the presence of both the Respondent and the accused suspect, Eaton, on June 14, 1962 and the same ancient and dilapidated wallet or billfold 'discovered' under the rear seat of the Eaton car."

The Special Commissioner further found that after the initial search of the Eaton car was concluded, the respondent had the car driven to the Ford garage so that the rearend could be raised by hoist or jack and pictures taken of the inside of the rear or "turtleback" for the purpose of showing marks which respondent contended were made by the Jackson safe; however, from other testimony the Commissioner found "that it would have been a physical impossibility to have put the safe in the trunk of the [Eaton] car."

From all of the evidence the Commissioner found that "the incriminating billfold was placed in the [Eaton] car between * * * June 7 and June 14"; that respondent had taken possession of the billfold on April 18, 1962; that he had admitted that he had individually (alone) made a search of the Eaton car three days after Eaton's arrest and "discovered" the billfold under the seat of the Eaton car; and that all of the evidence in the record leads to the "inescapable conclusion * * * that the billfold was deliberately placed or 'planted' by the respondent with the malicious, corrupt

or fraudulent intent that it be 'discovered' and used as evidence against * * * Eaton" to convict him of the Jackson burglary.

The Commissioner further found that the acts of respondent were designed to obstruct the administration of public justice and that, "[E]xcept for the knowledge of Trooper Carroll, the Sheriff may well have put in motion the accusative force, the discovery of highly incriminating evidence in the possession of Eaton, from which there could be no turning back." The Commissioner further found that respondent was guilty of willful and malicious oppression and misconduct in his official capacity as Sheriff of Ray County and that he had thereby forfeited said office.

█ The findings of fact, conclusions of law and recommendations of the Special Commissioner are not binding upon this court, only advisory. In re Wines, Mo.Sup., 370 S.W.2d 328, 333[3]; State ex inf. Miller v. St. Louis Union Trust Co., 335 Mo. 845, 74 S.W.2d 348, 353[1]. "The pleadings in an information in the nature of quo warranto are governed by the rules in civil cases rather than those which apply to criminal proceedings in matter of form as well as in matters of substance." State ex rel. Union Electric Light & Power Co. v. Grimm, 220 Mo. 483, 119 S.W. 626, 627; State ex inf. McKittrick v. Wiley, 349 Mo. 239, 160 S.W.2d 677, 683[1–4]; State ex inf. Connett v. Madget, et al., Mo.Sup., 297 S.W.2d 416, 427; State ex inf. McKittrick v. Wymore, 343 Mo. 98, 119 S.W.2d 941, 947[12], 119 A.L.R. 710. The issues to be tried are the issues made by the pleadings.

Section 558.110 RSMo 1959, V.A.M.S. provides that: "Every person exercising or holding any office of public trust who shall be guilty of willful and malicious oppression, partiality, misconduct or abuse of authority in his official capacity or under color of his office, shall, on conviction, be deemed guilty of a misdemeanor," but the present proceeding is not a criminal proceeding.

Instead, it is a civil proceeding which has been instituted solely for the purpose of determining whether the respondent has been guilty of the acts charged against him in the information, and, if guilty, whether he has forfeited his office and, if so, that this court remove him from the office.

■ In the trial of this case the relator assumed the burden of proof and proceeded to offer the testimony upon which relator now relies to have this court oust respondent from his official position as Sheriff of Ray County. State on inf. of Connett v. Madget, supra, 297 S.W.2d 416, 427[1] and State ex inf. Taylor v. Cumpton, 362 Mo. 199, 240 S.W.2d 877, 883[6].

Helpful as the Commissioner's report has been in our consideration of this case, we have, nevertheless, carefully read and studied the entire record, examined the controlling law governing the case and have reached our own conclusions as to the merits of the charge made against respondent and have determined the action. It must be kept in mind that all of the witnesses personally appeared before the Commissioner and he saw and heard them testify, observed their appearance on the witness stand and their actions and reactions under direct and cross-examination. Due deference must, of course, be given to his findings insofar as the determination of the credibility, weight and value of the oral testimony presented before him is concerned. Nevertheless, we must and have reached our own determination as to the credibility, weight and value of the oral testimony in the record since we can recognize direct conflicts, contradictions, evasions and other matters which appear upon the face of the cold record. In re Wines, supra, 370 S.W.2d 328, 333[1]. We have, however, reached the same conclusions as our Commissioner with reference to respondent's guilt of the charges filed against him.

Some of our reasons for our conclusions are as follows: The record clearly shows that respondent was a man of limited education and, as stated, there were many con-

flicts and contradictions in his testimony. Some of his testimony was directly contradicted by other testimony which our Commissioner believed and which we believe. It must be remembered that, according to respondent this was the largest burglary that had taken place in his county and it was his kinsman whose store was broken into. Respondent was extremely anxious to solve the burglary himself and, therefore, did not report that matter to the patrol or ask their assistance, although he said that he did. Later he had to admit that the patrol was not called in until the safe was found, when he said that he called them in and "they taken fingerprints from the safe." The safe was not found until April 18, 1962, as stated, although the burglary was committed on February 22. His interest in solving the burglary in part stemmed from his relationship to the owner of the store. He stated that until the night before the search of Eaton's car on June 8 or 9, 1962 he had never seen the billfold in question. He said that he alone had searched the Eaton car June 8th or 9th and that he found the billfold, although he and the others had not found it on the first search. Later he said: "Yeah, I had seen it years ago. I had saw the billfold in my Uncle's store. They had kept me for 8 or 10 years. I had saw the old billfold a lot of times." He later stated that he lived in the Jackson home when "a small boy * * * when I was between 8 and 10 years old."

The conflicts and contradictions in respondent's testimony are so numerous and with reference to so many matters that they may not be reviewed in this opinion. It is enough to say that his testimony was unsatisfactory and unbelievable in many respects. It appears, as stated, that Eaton was arrested on an alleged "tip" from Sammy Schrier, a prisoner in respondent's jail, held on a burglary charge. Respondent said he (respondent) reported the matter of the "tip" to the State Highway Patrol 3 to 4 weeks, 2 to 3 weeks, and 5 or 6 days before Eaton's arrest. The time changed as the cross-examination proceeded. Re-

spondent was also most difficult and evasive on cross-examination at the hearing before the Commissioner. Some time the same question would have to be repeatedly asked and evasive answers made until the Commissioner required a direct answer to a direct question. A reading of the cold record fully supports the Commissioner's disbelief of much of respondent's testimony.

The interest of respondent in the prosecution of Eaton appears from his efforts to use the dents in Eaton's car, as evidence of his having hauled the safe, and the alleged finding of checks and parts of checks in the car which he said he gave to Mr. Jackson. His theory of the dents in the car as evidence of its use in hauling the safe and of the finding of checks or parts of checks in Eaton's car were denied by other witnesses, which we consider more worthy of belief. The arrest of Eaton on suspicion is further evidence of respondent's anxiety to make a case. Further, the testimony that E. V. Jackson had posted a three-hundred dollar cash bond for the conviction of the man who got his safe and money may have influenced respondent's conduct.

Also, the repeated efforts of respondent in this case to gain sympathy by reason of his physical infirmities, the operation on his eyes, his prior injuries and his long effort to obtain his present position all tend to some extent to discredit his testimony in face of clear, direct and believable testimony that the billfold in question was found by Trooper Carroll at the time the safe was recovered; that the billfold was delivered to respondent; that the billfold was not in the Eaton car when the Eaton car was first searched by respondent and other officers; and that it was not in the car until respondent subsequently claimed to have found it and arranged for the subsequent searches.

The evidence fully satisfies us that the billfold in question was not in Eaton's car until placed there by respondent or at his direction.

Respondent received the billfold at the place where the safe was recovered and he was present when the Eaton car was first thoroughly searched and the billfold was not therein. Of necessity respondent knew the billfold was not in the car at that time. Thereafter respondent either placed the billfold in Eaton's car or had it placed therein, well knowing that it had been taken in the Jackson burglary and thereafter had been recovered and delivered to him. The arrangements thereafter by respondent for a legal search of the car to obtain the billfold for evidence for use in the prosecution of Eaton causes us to reach the conclusion that respondent has been guilty of willful and malicious oppression, misconduct and abuse of authority in his official capacity and under color of his office as sheriff of said county and that he has forfeited the said office of sheriff; that the said office is now vacant and respondent is a usurper thereof. He must be and hereby is ousted therefrom.

In view of the amount of the costs in the proceeding which are hereby assessed and taxed against respondent, a penalty of only Five-Hundred ($500) Dollars is assessed and taxed against him by reason of the facts and circumstances shown herein, and relator shall recover the same from respondent, together with the costs of this proceeding.

It is so ordered.

All concur except HOLMAN, J., absent.